**[J-30-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 96 MAP 2023 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 160 MDA |
| | : | 2022 dated January 6, 2023 |
| v. | : | Affirming the Judgment of Sentence |
| | : | of the Dauphin County Court of |
| | : | Common Pleas, Criminal Division, |
| MICHAEL L. STRUNK, | : | at No. CP-22-CR-0000106-2020 |
| | : | dated December 1, 2021. |
| Appellant | : | |
| | : | ARGUED: April 10, 2024 |

**<u>OPINION</u>**

**JUSTICE McCAFFERY**            **DECIDED: October 24, 2024**

I.      INTRODUCTION

Section 6318 of the Pennsylvania Crimes Code, entitled "Unlawful contact with [a] minor[,]" criminalizes being "in contact with" a minor for the purpose of engaging in various crimes identified in the statute. 18 Pa.C.S. § 6318. The question before this Court is whether being "in contact with[,]" as set forth in the statute, includes conduct that is not communicative in nature. While acknowledging the communicative focus of the statute, the Superior Court concluded evidence that Strunk "engaged in physical contact with [the victim] beyond the assaults themselves[,]" such as pulling down the victim's pants, was sufficient to establish a violation of Section 6318. *Commonwealth v. Strunk*, 292 A.3d 1079 (Pa. Super. 2023) (unpub. memo. at *4). We disagree. The history of the statute

demonstrates it was intended to criminalize communicative behavior not otherwise covered by the Crimes Code. Because we conclude the Commonwealth failed to identify any evidence of record to support a finding that Strunk communicated with the victim for the purpose of facilitating the assaults, we vacate Strunk's conviction for unlawful contact with a minor.

## II.      FACTUAL BACKGROUND

The victim testified at trial that approximately one week before her 17th birthday, she was asleep on the living room couch in the home she shared with her mother and Strunk. She awoke to find Strunk fondling her breast under her shirt. Though she woke up, she said nothing and pretended to remain asleep. Strunk eventually pulled down her pants and underwear and inserted his penis into her vagina.

After ejaculating, Strunk whispered "something" in the victim's ear, though she could not recall what he said. N.T., 7/22-23/2021, at 64. On cross-examination, the victim reiterated her lack of memory, but denied that the whisper was a threat. Strunk then procured a towel and wiped down the victim's legs. Throughout this encounter, she continued to feign sleep.

The victim did not report the assault to her mother because she "didn't want to believe it was true." N.T., 7/22-23/2021, at 65. Further, the victim denied discussing the assault with Strunk before he assaulted her again approximately one month later.

In the second assault, the victim was once again on the couch in the living room, recuperating from having multiple teeth removed and under the influence of painkillers. Since her gums were still bleeding, her mouth was full of gauze.

The victim's mother fed her protein milkshakes because the victim could not chew. At one point, the victim's mother left her alone on the couch to go to the store to purchase

more milkshakes. Strunk entered the living room and once again fondled the victim's breast. This time, however, the victim resisted Strunk's assault, eventually causing him to leave her alone, but not before he digitally penetrated the victim's vagina. The victim was unsure if Strunk said anything to her prior to or during the assault. She did not report this assault to her mother because she was embarrassed.

Finally, several days after the second assault, the victim was asleep in her bedroom when Strunk entered to play a videogame. The victim had previously given Strunk permission to play games on her television because her mother did not want him playing them on the television in their bedroom. Although she briefly awoke when Strunk entered, the victim started to doze off while Strunk was playing.

Strunk eventually turned off the game and left the room. Shortly thereafter, he returned to the victim's bedroom wearing only a robe. Once again, Strunk began by fondling the victim's breast, then removed her pajama pants and inserted his penis in her vagina. The victim again feigned sleep during the assault.

This assault was interrupted, however, when the victim's mother walked in. Both Strunk and the victim were covered by a blanket, and her mother demanded to know what was happening. The victim did not answer, but Strunk challenged the victim's mother and directed her to "go back to bed." N.T., 7/22-23/2021, at 77. The victim's mother became visibly upset and refused to leave, so Strunk took her back to her bedroom. The victim put her pants back on and went to talk to her mother.

When the victim's mother threatened to call the police, the victim convinced her not to, since she was worried that she and her mother would return to homelessness, and the victim wanted to finish high school. Instead, they purchased a lock for victim's

bedroom door. While she was aware of several times that Strunk attempted to pick the lock, she did not testify to any knocking or other attempts to communicate with her. Further, the victim testified that she never discussed the previous assaults with Strunk before the final assault. Eventually, the victim committed herself to psychiatric care due to the mental and emotional trauma of the assaults. This triggered a police investigation, and, in turn, led to Strunk's arrest and conviction for unlawful contact with a minor, among other crimes.

III.    PROCEDURAL HISTORY OF THIS APPEAL

After the verdict, Strunk filed a pre-sentence motion for arrest of verdict arguing the evidence was insufficient to sustain his conviction for unlawful contact with a minor. The trial court denied the motion, and imposed consecutive sentences of five to ten years of incarceration for each of two sexual assault convictions and one aggravated assault conviction, a sentence of two to five years of incarceration for the corruption of minors conviction – to be run consecutively to the assault convictions, and a sentence of five to ten years of incarceration for the unlawful contact with a minor conviction – to run concurrently with the aggravated indecent assault conviction. The aggregate sentence was a term of 17 to 35 years' incarceration.

Strunk filed timely post-sentence motions challenging the weight of the evidence supporting the verdicts and the consecutive nature of his sentences. The trial court denied Strunk's post-sentence motions. Strunk then filed a timely appeal to the Superior Court. The trial court did not direct Strunk to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

In a unanimous, unpublished decision, the Superior Court affirmed. *See Strunk*, *supra*. The Court concluded the evidence was sufficient to convict Strunk of unlawful contact with a minor.

In reviewing the sufficiency claim, the Superior Court viewed the evidence in the light most favorable to the Commonwealth — the verdict winner — to determine if the fact finder had sufficient evidence to find every element of unlawful contact with a minor beyond a reasonable doubt. The Court noted Section 6318 requires proof the defendant engaged in verbal or nonverbal communication with a minor to bring about sexual contact, beyond physically approaching the minor or the physical contact of the sexual act itself, quoting its decision in *Commonwealth v. Rose*, 960 A.2d 149, 152 (Pa. Super. 2008), in which it stated the statute was "best understood as 'unlawful communication with a minor.'" *Strunk*, 292 A.3d at *3.

While the Court acknowledged there was no evidence Strunk verbally communicated with the victim or gave nonverbal signals to achieve the sexual contact, it found the element of communication was satisfied by evidence that Strunk "engaged in physical contact with [the victim] beyond the assaults themselves to facilitate his sexual contact with [the victim.]" *Strunk*, 292 A.3d at *4. Therefore, it concluded Strunk's sufficiency claim respecting the unlawful contact with a minor conviction was meritless.

IV.   ISSUE PRESENTED

We granted Strunk's petition for allowance of appeal, directing the parties to address the following question:

> Whether the Superior Court erred in affirming [Petitioner's] conviction for unlawful contact with a minor where the complainant testified that the sole verbal contact was in the first incident after any criminal offense was completed, and the Superior Court held that a step necessary for a greater sex offense constituted "contact," for purposes of the statute.

*Commonwealth v. Strunk*, 306 A.3d 250 (Pa. October 17, 2023) (per curiam) (brackets in original).

V.      STANDARD OF REVIEW

While phrasing his challenge as disputing the sufficiency of the evidence supporting his conviction for violating Section 6318, Strunk asserts "the issue is properly one of statutory construction." Strunk's Brief at 16.  The Commonwealth treats this appeal as a run-of-the-mill challenge to the sufficiency of the evidence.  *See* Commonwealth's Brief at 6.  The issue quoted in our order granting Strunk's petition for review does not explicitly define the nature of the issue before us.  On the one hand, the word "sufficiency" is nowhere in the quoted issue.  On the other, the issue argued before the Superior Court was clearly a challenge to the sufficiency of the evidence.  *See Strunk*, 292 A.3d at *4. However, it is equally clear that Strunk's position before the Superior Court was that "the evidence at trial was insufficient … because there was no evidence that he communicated with [the victim] to accomplish any of the sexual assaults."  *Id*.   We determine that the issue presented, as phrased in our *per curiam* order, requires interpretation of the statute, and not mere rote application of the statute to the record.  Thus, the issue is one that necessarily involves statutory construction.

In construing a statute, we seek to "ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a).  The primary indicator of the legislature's intent is the statute's plain language.  *See Commonwealth v. Lehman*, 311 A.3d 1034, 1044 (Pa. 2024) (citation omitted).  To interpret the meaning of words that the statute does not explicitly define, "we turn to an examination of dictionary definitions." *Ursinus College v. Prevailing Wage Appeals Board*, 310 A.3d 154, 171 (Pa. 2024) (internal quotation marks

and citation omitted).  If the plain language is clear and unambiguous, that unambiguous interpretation controls.  *See Lehman, supra*.

On the other hand, if the plain language is ambiguous, we must go beyond the text and consider other factors.  *See A.S. v. Pennsylvania State* Police, 143 A.3d 896, 903 (Pa. 2016).  These factors include, but are not limited to:

> the occasion and necessity for the statute or regulation; the circumstances under which it was enacted; the mischief to be remedied; the object to be attained; the former law, if any, including other statutes or regulations upon the same or similar subjects; the consequences of a particular interpretation; and administrative interpretations of such statute.

*Id*. (citation omitted).

Once we have properly construed Section 6318, we must determine whether the evidence admitted at trial, viewed in the light most favorable to the Commonwealth – including drawing all reasonable inferences in its favor – supports the jury's verdict.  *See Commonwealth v. Murray*, 83 A.3d 137, 150-151 (Pa. 2013).  As this is a question of law, we review the issue *de novo* and our scope of review is plenary.  *See id*. at 151.

VI.  THE TEXT OF CURRENT SECTION 6318

The full text of the current statute is:

> **(a) Offense defined.--**A person commits an offense if the person is intentionally in contact with a minor, or a law enforcement officer acting in the performance of duties who has assumed the identity of a minor or of another individual having direct contact with children, as defined under 23 Pa.C.S. § 6303(a) (relating to definitions), for the purpose of engaging in an activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within this Commonwealth:
> > (1) Any of the offenses enumerated in Chapter 31 (relating to sexual offenses).
> > (2) Open lewdness as defined in section 5901 (relating to open lewdness).
> > (3) Prostitution as defined in section 5902 (relating to prostitution and related offenses).

(4) Obscene and other sexual materials and performances as defined in section 5903 (relating to obscene and other sexual materials and performances).

(5) Sexual abuse of children as defined in section 6312 (relating to sexual abuse of children).

(6) Sexual exploitation of children as defined in section 6320 (relating to sexual exploitation of children).

**(b) Grading.--**A violation of subsection (a) is:

(1) an offense of the same grade and degree as the most serious underlying offense in subsection (a) for which the defendant contacted the minor; or

(2) a felony of the third degree;

whichever is greater.

**(b.1) Concurrent jurisdiction to prosecute.--**The Attorney General shall have concurrent prosecutorial jurisdiction with the district attorney for violations under this section and any crime arising out of the activity prohibited by this section when the person charged with a violation of this section contacts a minor through the use of a computer, computer system or computer network. No person charged with a violation of this section by the Attorney General shall have standing to challenge the authority of the Attorney General to prosecute the case, and, if any such challenge is made, the challenge shall be dismissed and no relief shall be available in the courts of this Commonwealth to the person making the challenge.

**(c) Definitions.--**As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

**"Computer."** An electronic, magnetic, optical, hydraulic, organic or other high-speed data processing device or system which performs logic, arithmetic or memory functions and includes all input, output, processing, storage, software or communication facilities which are connected or related to the device in a computer system or computer network.

**"Computer network."** The interconnection of two or more computers through the usage of satellite, microwave, line or other communication medium.

**"Computer system."** A set of related, connected or unconnected computer equipment, devices and software.

**"Contacts."** Direct or indirect contact or communication by any means, method or device, including contact or communication in person or through an agent or agency, through any print medium, the mails, a common carrier or communication common carrier, any electronic communication system and any telecommunications, wire, computer or radio communications device or system.

**"Minor."** An individual under 18 years of age.

18 Pa.C.S. § 6318.

VII. ANALYSIS

A. WAIVER

Initially, we must address the Commonwealth's claim that Strunk has waived any challenge to the sufficiency of the evidence supporting his conviction under Section 6318. The Commonwealth's argument regarding waiver consists of a single sentence: "[B]y challenging the weight of the evidence to support his unlawful contact conviction in the trial court and Superior Court, [Strunk] has waived his challenge to the sufficiency of the evidence claim he raises." Commonwealth's Brief at 6 (*citing Commonwealth v. Widmer*, 744 A.2d 745 (Pa. 2000)).

The basis of the Commonwealth's argument is not entirely clear. To the extent the Commonwealth is claiming Strunk failed to properly preserve his sufficiency challenge in the trial court or the Superior Court, such a claim is belied by both the law and the record. Under our Rules of Criminal Procedure, a defendant may challenge the sufficiency of the evidence to sustain a conviction for the first time on appeal. *See* Pa.R.Crim.P. 606(A)(7). The Superior Court addressed Strunk's sufficiency challenge on the merits, and the Commonwealth does not identify any point in these proceedings where Strunk failed to preserve the issue.

To the extent the Commonwealth's citation to *Widmer* indicates a belief Strunk conceded the sufficiency of the evidence to support his conviction under Section 6318 by also raising a challenge to the weight of the evidence, we note that *Widmer* does not stand for that proposition. While *Widmer* properly notes that a challenge to the weight of the evidence "concedes that there is sufficient evidence to sustain the verdict[,]" *Widmer*, 744 A.2d at 751, for the purpose of analyzing the weight challenge, it does not purport to establish the entirely distinct proposition that an appellant cannot challenge both the

sufficiency and the weight of the evidence as alternative grounds for relief. Accordingly, we reject the Commonwealth's contention that Strunk has waived any challenge to the sufficiency of the evidence supporting his conviction under Section 6318.

## B. THE SUPERIOR COURT'S CONSTRUCTION OF THE STATUTE

As noted above, the Superior Court panel acknowledged that Section 6318 was "best understood as 'unlawful communication with a minor.'" *Strunk*, 292 A.3d at *3 (*citing Rose*, 960 A.2d at 153). This construction of Section 6318 has been consistent in the Superior Court for over 15 years.

For several years post-enactment, Section 6318 failed to generate much precedent.[1] However, the Superior Court published two opinions in 2006 addressing the sufficiency of the evidence supporting convictions under the statute. *See Commonwealth v. Evans*, 901 A.2d 528, 537 (Pa. Super. 2006) ("Here, the contact[] proscribed by [Section 6318] took place when Appellant called the minor victim over to his car, asked her if she liked him, told her that there were things that he wanted to do to her, asked her for a hug, and told her to look up at him."); *Commonwealth v. Morgan*, 913 A.2d 906, 911 (Pa. Super. 2006) (concluding that instant messages sent to a victim through the internet were "sufficient to affirm Appellant's conviction for violating 18 Pa.C.S. Section 6318.").

---

[1] While this Court has previously addressed issues under Section 6318, we have never decided the precise issue before us. Rather, in both prior cases, we considered the proper sentencing of defendants pursuant to Section 6318(b), but have not construed Section 6318(a)'s substantive language. *See Commonwealth v. Reed*, 9 A.3d 1138 (Pa. 2010) (concluding the default sentencing provision of Section 6318(b) applied where defendant was acquitted of all substantive charges); *Commonwealth v. Aikens*, 168 A.3d 137 (Pa. 2017) (affirming grading of a conviction under Section 6318 as a first-degree felony despite the defendant being acquitted of the substantive offense because the trial court instructed the jury it had to find defendant sought to commit the substantive offense to convict under Section 6318).

Similarly, in early 2008, the Superior Court concluded that, as "evidenced by Appellant's words and gestures, he clearly 'contacted' a 'minor' in 'this Commonwealth' within the purview of" Section 6318. *Commonwealth v. Oliver*, 946 A.2d 1111, 1114 (Pa. Super. 2008) (footnote omitted) (extending definition of "in contact with" to non-verbal communication).

Later in 2008, the Superior Court observed in *Rose*, *supra*, that Section 6318 "is best understood as 'unlawful **communication** with a minor.'" *Rose*, 960 A.2d at 152 (emphasis in original). It explained the "communication may take place in person, on the telephone, via a computer, or in other ways." *Id*. at 153 (citation omitted). The panel observed that Section 6318 is violated "as of the moment of communication," and therefore, no other act is necessary to support the conviction. *Id.*

In *Commonwealth v. Velez*, 51 A.3d 260 (Pa. Super. 2012), a panel of the Superior Court found unlawful contact was established based on its conclusion that it was reasonable to infer the defendant "directed the victim, either verbally or nonverbally, to unclothe below the waist and to assume [a] pose [of lying on her back with her legs in the air.]" *Id.* at 267.

A few years later, another panel of the Superior Court reiterated that "contact" under Section 6318 requires the use of verbal or physical communication to achieve the sexual assault. *See Commonwealth v. Leatherby*, 116 A.3d 73, 79-80 (Pa. Super. 2015). In *Leatherby*, the Court distinguished Leatherby's conduct towards separate victims. For one victim, testimony established that Leatherby woke the victim by touching her breast and buttocks. *See id.* at 80. However, the victim denied that Leatherby ever spoke, and there was no evidence of other communicative behavior. *See id.* The Court concluded

the evidence was insufficient to support Leatherby's Section 6318 conviction based solely on his conduct towards the victim. *See id*. at 79-80. In contrast, the Court concluded the evidence was sufficient to convict Leatherby under Section 6318 for his conduct toward two other victims, based on testimony that he asked the victims to hug him before he engaged in sexual contact. *See id*. at 80. Additionally, the Court concluded Leatherby non-verbally communicated his desire for a victim to see him naked by failing to acknowledge her knock on a bathroom door. *See id*. at 80-81.

In 2019, the Superior Court reiterated that communication is the touchstone for Section 6318 convictions. *See Commonwealth v. Davis*, 225 A.3d 582, 587 (Pa. Super. 2019) ("[T]he crime of Unlawful Contact with a Minor focuses on communication, verbal or non-verbal…." (emphasis omitted)). There, the Court concluded the evidence was sufficient to support the conviction because Davis described what he was about to do to the victims before he sexually assaulted them. *See id*. at 588.

Thus, the Superior Court has consistently confirmed that the statute is fundamentally concerned with communication. Even the panel below acknowledged this focus, and neither the Commonwealth nor Strunk deny that Section 6318 is centered on communicative behavior. *See* Strunk's Brief at 31; Commonwealth's Brief at 8-9.

C. STATUTORY CONSTRUCTION

The terms "contact" and "in contact with" are not explicitly defined in Section 6318. However, Section 6318 does define the nearly identical term "contacts." While at first blush this is confounding, a review of the textual history of the section reveals this is likely an artifact of an imperfect amendment system.

When enacted in 1997, the statute utilized the term "contacts or communicates with" to define the prohibited conduct. Thus, one might reasonably conclude that

"contacts" was intended to be something distinct from "communicates with."  However, there is no indication that Pennsylvania courts applied these terms as separate concepts.

In 2002, the legislature modified the language of the statute twice.  The primary relevant change was the deletion of the words "or communicates with" from subsection (a), leaving only "contacts" as the criminalized act.  Similarly, "or communicates with" was deleted from subsection (c), leaving the defined term as "contacts[.]"  Notably, however, the term "or communication" was left untouched in the definition of "contacts."  Finally, subsection (b.1) mirrored the language from subsection (a) in defining the prohibited conduct, utilizing the term "contacts[.]"

Less than a month later, the legislature again shortened the text of subsection (a):

> **(a) Offense defined.**  --  A person commits an offense if he is intentionally in contact with a minor for the purpose of engaging in an activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within this Commonwealth[.]

18 Pa.C.S. § 6318(a) (effective Feb. 7, 2003).  Here, the legislature replaced "contacts" with the idiom "is … in contact with[.]"  However, the legislature did not modify either subsection (b.1) or (c).  Thus, subsection (b.1) still utilized the verb "contacts" while subsection (c) no longer contained an explicit definition for the conduct prohibited in subsection (a): "is … in contact with[.]"

The legislature provided no commentary to explain these amendments.  Nor is there any clear intent to be derived from the changes themselves.

Similarly, the legislature's removal of "communicates" from subsection (a) is arguably important to our analysis.  And yet the legislature retained the communicative focus in the definition of "contacts:"  "Direct or indirect contact or communication by any means, method or device, including contact or communication in person or through an

agent or agency, through any print medium, the mails, a common carrier or communication common carrier, any electronic communication system and any telecommunications, wire, computer or radio communications device or system." 18 Pa.C.S. § 6318(c). Once again, the legislature provided no rationale for the changes, though one reasonable hypothesis is that it desired to avoid any implication that "communication" was something separate from being "in contact with." Also possible, however, is that viewing the alteration in isolation, we could reasonably conclude that the legislature intended to broaden the scope of the statute by leaving only a version of the verb "contact" as the prohibited conduct.

Since then, the legislature amended the statute two more times. In 2006, it modified Subsection (a) to include "sting" operations where a law enforcement officer impersonates a minor. *See* 18 Pa.C.S. § 6318 (effective Jan. 1, 2007).[2] Prior to this amendment, defendants caught in "sting" operations were prosecuted for attempted unlawful contact with a minor. *See*, *e.g.*, *Rose*, 960 A.2d at 152 n.6. The criminalized behavior remained "is … in contact with a minor[.]" 18 Pa.C.S. § 6318(a) (effective Jan. 1, 2007). The only other change was an increase in the minimum grading of a conviction under the statute from a first-degree misdemeanor to third-degree felony. *See* 18 Pa.C.S. § 6318(b) (effective Jan. 1, 2007).

Similarly, in 2023, the legislature modified Subsection (a) to allow law enforcement officers to impersonate not just children, but also those who have "direct contact with

---

[2] This is the version of Section 6318 in effect in 2019, when Strunk assaulted the victim. The differences between this version and the current version of the statute do not impact our analysis.

children," as defined in the Child Protective Services Law. 18 Pa.C.S. § 6318 (effective Feb. 12, 2024). The Child Protective Services Law defines "[d]irect contact with children" as "the care, supervision, guidance, or control of children or routine interaction with children." 23 Pa.C.S. § 6303(a).

Turning to dictionary definitions, we observe that most dictionaries provide two definitions for "contact" when used as a verb. As a transitive verb, contact is defined as either "touch" or "communicate." https://dictionary.cambridge.org/us/dictionary/english/contact, last accessed July 2, 2024; *see also* https://www.merriam-webster.com/dictionary/contact, last accessed July 2, 2024 (defining contact as a transitive verb as "to bring into contact," "to enter or be in contact with," or "to get in communication with"). Thus, the dictionary definitions do not dispel any ambiguity.

The phrase "come in contact with" is also an idiom. http://www.merriam-webster.com/dictionary/come%20in%20contact%20with, last accessed July 2, 2024. An idiom is "an expression in the usage of a language that is peculiar to itself either in having a meaning that cannot be derived from the conjoined meanings or its elements (such as *up in the air* for 'undecided') or in its grammatically atypical use of words (such as *give way*)." http://www.merriam-webster.com/dictionary/idiom, last accessed July 2, 2024. The idiom "in contact with" a person is exclusively defined in terms of communication. *See* www.merriam-webster.com/dictionary/come%20in%20contact%20with, last accessed July 2, 2024 (defining the idiom "come in/into contact with" as "to see and begin communicating with (someone)"); *see also* www.dictionary.cambridge.org/us/dictionary/english/in-contact-with, last accessed July 2,

2024 (defining "in contact with someone" as "in communication with someone, especially by speaking or writing to them regularly[.]").  The idiom does, however, also connote touching reference, when the direct object is "something."  *See id*.

Further highlighting the ambiguity of the language, the legislature used the phrase "has … contact with" to mean physical contact in the statute defining indecent assault, 18 Pa.C.S. § 3126(a) – one of the predicate crimes referenced in Section 6318(a)(1). Indecent assault occurs when a "person has indecent contact with the complainant …." 18 Pa.C.S. § 3101.  And "indecent contact" is explicitly defined as "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person."  *Id*.  Thus, when read *in pari materia* with Sections 3101 and 3126, there is reason to believe Section 6318's "in contact with" language means physical contact.

Under all these circumstances, the plain text does not resolve the issue of whether the legislature used "contact" to refer solely to communication, or whether it intended to also use the alternative definition of a physical touching.  We therefore must turn to the legislative history of Section 6318.

D.  LEGISLATIVE HISTORY

In remarks on the bill's final passage in the Pennsylvania House of Representatives in 1997, before it was referred to the Senate, Representative Matthew E. Baker, the bill's sponsor, described the purpose of Section 6318:

> I want to talk about something that is tragic and disturbing, even chilling. It is the use of the Internet by pedophiles to target and recruit children for exploitation. It is extremely sad that some twisted individuals are using the incredible advances in computer and telecommunications technology to victimize children, but they are.

According to Ernest Allen, president of the National Center for Missing and Exploited Children, it is impossible to estimate how many children are victimized in cyberspace. In part, this is because child rape and molestation are the most underreported crimes. Even so, a 1992 report by the National Victim Center revealed that 61 percent of all rape victims are under 18 and 32 percent of all rape victims are 12 to 17 years old. And in 1996, the U.S. Department of Justice released a study showing that 78 percent of all inmates serving time in State prison for sexual assault had in fact abused a child. Thirty percent of these inmates had abused multiple victims.

The National Center often becomes aware of sexual crimes involving online access when the targeted child runs away from home in order to meet the "friend" he met through the Internet. These pedophiles, dubbed "cyber enticers," freely roam the Internet searching for young prey. They find children through chat rooms, bulletin boards, and online sites designed for and frequented by children. They masquerade as a member of the targeted child's peer group, gain trust, and then exploit that child.

Recently, in testimony before the U.S. Senate, Mr. Allen and the National Center encouraged States to play a larger role in combating cybersex crimes. States, together with Federal authorities, must make the Internet a scary place for the cyber enticer.

According to the National Center, 13 States already have cybersex laws: criminal statutes which prosecutors can use to go after pedophiles using the Internet. I want Pennsylvania to be the 14th.

My bill, HB 474, makes it a crime to intentionally contact or communicate with a child for the purpose of exploiting that child sexually. **The term "contacts or communicates with" includes using any electronic or telecommunications system to exploit a child, including a computer**. Additionally, the bill contains language so that cyber enticers outside of Pennsylvania who attempt to prey on the Commonwealth's children will be able to be brought to justice here, under our criminal long-arm jurisdiction statute.

My belief is that we must give our police and prosecutors "high tech" statutes so that they can go after "high tech" pedophiles. If these predators are going online, so must our criminal law.

I ask for an affirmative vote. Together let us make Pennsylvania a frightening place for any cyber enticer that dares to communicate with any of the Commonwealth's children.

…

Q & A for HB 474[:]

1. Why do we need a law aimed at putting cyber enticers in jail, especially when there is Federal law?

The best way to answer that is to paraphrase what Ernest Allen, the president of the Center for Missing and Exploited Children, has said about the need for local and State participation in cybersex cases. In testimony before Congress, he said that local law enforcement has a vital role to play. Local police are often the first point of contact for the victim and his or her family. Local police and district attorneys have a real interest in making sure that the children within their jurisdictions are safe. Moreover, if Federal authorities decide not to prosecute, the case disappears, but the victim remains. The only way to deter cyber predators is to construct a legal web so tight - at the State and Federal levels - that there is a real threat they will be caught.

Speaking as a legislator, we owe it to our children, Pennsylvania's children, to enact an anti-cyber enticer law.

2. Does your bill affect the First Amendment right to free speech in any way?

The U.S. Supreme Court has made it very clear that child pornography is not protected by the First Amendment. When an adult induces a child to commit a sexual act and then records it on film, it is a crime. When an adult attempts to lure a child to his home in order to exploit that child sexually, it is a crime. These are not examples of constitutionally protected speech. So the Commonwealth is within its right to criminalize hunting children on the Internet for the purpose of sexual exploitation.

But the concern about speech is a valid one. Just to make sure we got it right, we worked with the National Center for Missing and Exploited Children, the prosecutor of a State which has successfully used its anti-cyber enticer law in criminal prosecutions, and the American Civil Liberties Union. All said my bill passes constitutional muster.

3. **Do existing criminal statutes not take care of cyber enticers?**

**Yes and no. While it is true that existing criminal statutes are available to prosecutors, there may be some confusion as to how they apply to communications on the Internet.** FBI Director Louis Freeh has talked about the need to build strong legal precedents in order to gain convictions. I cannot think of a better way to build that than by enacting legislation designed to stop cyber enticers dead in their tracks. Further, my bill includes language which specifically applies to predators outside the

Commonwealth who would try to contact a child within Pennsylvania in order to steal his innocence. This way, the Commonwealth can exert its "long-arm" jurisdiction over this predator and bring him to trial here - where the crime was committed and where the evidence is.

These predators are clever. They pretend to be a member of the child's peer group, **establish trust through a series of contacts with the child** - through the use of bulletin boards, chat rooms, and e-mail - and then either go "visit" the child, lure him into running away from home, or kidnap him. Since these pedophiles have gone "high-tech," our criminal laws must, too. **Thirteen other States have some kind of anti-cyber enticer statute. It is time that Pennsylvania become the 14th.**

Pa. H. J., 1997 Reg. Sess. 52 at 1750-1751 (emphases added). While these statements, much as any legislative history, are not definitive, they provide evidence that supports the Superior Court's long line of case law classifying Section 6318 as focused on communication.

The subsequent amendments to the statute also shed light on the proper construction of Section 6318. In 2002, the legislature added subsection (b.1) to the statute. That subsection provides for concurrent jurisdiction between the Attorney General and district attorneys for violations of Section 6318, "when the person charged with a violation of this section contacts a minor through the use of a computer, computer system or computer network." 18 Pa.C.S. § 6318(b.1) (effective Jan. 19, 2003). In this sentence the legislature clearly used "contacts" in its communicative understanding – it makes no sense to talk about physically touching a minor through a computer, computer system or computer network.

In 2006, the legislature unequivocally broadened the scope of Section 6318. It added language to subsection (a): "A person commits an offense if he is intentionally in contact with a minor, or a law enforcement officer acting in the performance of his duties who has assumed the identity of a minor, …." 18 Pa.C.S. § 6318 (effective Jan. 1, 2007)

(underlined language added by legislature in 2006). The legislative intent of this addition is clear: to allow police officers to impersonate a minor through the use of communications technology. When the amendment was enacted, a current law enforcement officer, by definition, was not (and still is not) a minor. *See* 37 Pa.Code § 203.11(a)(1) (providing that, as of December 21, 1996, all police officers must be 18 years of age or older). Utilizing the "touch" definition of "contact" makes no sense under this amendment.

Similarly, in 2023, the legislature once again added language to Section 6318 to allow police officers to perform "sting" operations: "A person commits an offense if <u>the person</u> is intentionally in contact with a minor, or a law enforcement officer acting in the performance of duties who has assumed the identity of a minor <u>or of another individual having direct contact with children, as defined under 23 Pa.C.S. § 6303(a) (relating to definitions)</u>, …." 18 Pa.C.S. § 6318(a) (effective Feb. 12, 2024) (underlined language added by the legislature in 2023). The added language utilizes another form of the verb "contact" – "direct contact with children[.]" And the legislature provides an explicit definition for this term through cross reference: "[t]he care, supervision, guidance or control of children or routine interaction with children." 23 Pa.C.S. § 6303(a). This explicit definition of "direct contact" is incompatible with the "touch" definition of the verb "contact." The "care, supervision, guidance or control of children" does not require physical touching. Rather, these terms are all forms of communication with children.

And even more, this amendment dispels any notion that the initial use of "in contact with" utilizes the "touch" definition of "contact." It would make no sense to find a person guilty of "unlawful contact with [a] minor" for touching an adult police officer who was

impersonating another adult who was responsible for the "care, supervision, guidance or control of children."  By contrast, criminalizing the conduct of a person communicating with an adult who is responsible for the "care, supervision, guidance or control of children" for the purpose of committing, for instance, a sexual assault on a minor fits squarely within the concept of Section 6318.

Given this legislative history, we conclude the Superior Court has been consistently correct in recognizing the communicative focus of Section 6318.  Section 6318 does not criminalize inappropriate touching of minors; other statutes accomplish that goal.  Section 6318 is perhaps best described as an anti-grooming statute.  But even that description is imperfect.  Any communication that is intended to further the commission of one of the crimes listed in Section 6318(a), whether it fits the definition of grooming or not, falls within the prohibition.

Even the panel below acknowledged this understanding when first discussing Section 6318: "The element of contact requires proof that the defendant engaged in some verbal or nonverbal communication with the minor for purposes of sexual contact beyond physically approaching the minor and the physical contact of the sexual act itself."  *Strunk*, 292 A.3d at *3.  Unfortunately, when the panel applied the law to the facts, it failed to utilize this standard.  Instead, it focused on the victim's testimony that Strunk "removed or pulled down her clothing in order to commit the sexual assaults ...."  *Id*. at *4.  Despite the victim's testimony that she was feigning sleep while Strunk manipulated her clothes, the panel concluded that "evidence that [Strunk] engaged in physical contact with [the victim] beyond the assaults themselves to facilitate his sexual contact with Victim is sufficient to prove the element of communication."  *Id.*  The panel failed to explain how

such conduct was communicative, and in doing so, read the communication requirement out of the statute.  This conclusion does not follow from the statute's requirements, even as set forth by the panel itself.

### E.  SUPPORT FOR AN INFERENCE OF COMMUNICATION

The Commonwealth's alternative argument that the evidence was sufficient to allow the jury to **infer** Strunk communicated with the victim to further the assaults also fails.  In *Velez*, *supra*, there was no evidence about how the victim's clothes were removed or why the victim had her legs in the air.  While the propriety of *Velez*'s explicit reasoning is beyond the scope of this appeal, the panel there clearly relied on the absence of explicit evidence to conclude the evidence at trial was sufficient.  In contrast, here, the victim's own testimony negates any such inference.  The victim testified that Strunk manipulated her clothing while she pretended to sleep.  Further, the victim testified Strunk did not communicate with her, either verbally or non-verbally, while he was removing her clothing.  Because this is the only evidence about how the assaults occurred, it would be rank speculation for the jury to infer Strunk communicated with the victim based solely on evidence that the assault occurred.

## VIII.   CONCLUSION

In short, the Superior Court conflated verbal, written, and other forms of non-verbal communicative efforts to mean any form of physical contact.  That is not the purpose or intent of Section 6318.  Rather, Section 6318 is intended to criminalize and punish communication designed to induce or otherwise further the sexual exploitation of children.  As the record before us cannot establish that Strunk communicated with the victim to

facilitate his assaults, his conviction for unlawful contact with a minor cannot stand.  Thus, we vacate Strunk's conviction for unlawful contact with a minor.[3]

Jurisdiction relinquished.

Chief Justice Todd and Justices Dougherty and Brobson join the opinion.

Justice Wecht files a concurring opinion in which Justice Donohue joins.

Justice Mundy files a dissenting opinion.

---

[3] As the sentence for this conviction was imposed concurrently, this result does not impact the aggregate sentence and, therefore, does not disturb the sentencing scheme.